Estate of Robert Haverty, Deceased, Idelle M. Haverty, Executrix v. Commissioner.
Estate of Robert Haverty v. Commissioner
Docket Nos. 33832, 34463.
United States Tax Court
1953 Tax Ct. Memo LEXIS 62; 12 T.C.M. (CCH) 1295; T.C.M. (RIA) 53359; November 12, 1953
P. K. Seidman, Esq., Farnsworth Building, Memphis, Tenn., for the petitioner. Charles R. Hembree, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: These proceedings were consolidated for hearing and involve deficiencies in income taxes for the calendar years 1945 and 1947, in the respective amounts of $3,798.45 and $815.58 in Docket No. 33832, and for the calendar year 1948. $646.38 in Docket No. 34463. By an amendment in writing to his answer in Docket No. 33832 to conform to proof, respondent asks that the deficiency for 1947 be increased to $5,740.95. The petitions alleged error in the disallowance in 1947 of a business bad debt in the amount of $34,989.31 and a long-term capital loss of $7,500 on account of worthlessness of stock, and the disallowance in each year *63 of a certain amount as a deduction for a carry-over or carry-back loss. Respondent alleged in his amended answer that taxable net income for 1947 should be increased by $13,614.98 to reflect the decedent's share of the profits of a partnership. Findings of Fact The stipulated facts are so found. The petitioner is the estate of Robert Haverty who died after the filing of the petitions herein, and is hereinafter called decedent. His wife, Idelle M. Haverty, is the qualified executrix of his estate. In each of the taxable years decedent filed his income tax returns with the collector of internal revenue for the district of Tennessee. He reported personal items of income and deductions related thereto on the cash basis, while business income and deductions relating to business activities he reported on the accrual basis. On July 1, 1946, and for several years prior thereto, decedent was engaged in the business of "factory representative" as a sole proprietorship. On July 1, 1946, the business was succeeded by a partnership formed on June 30, 1946, by decedent and his son, James C. Haverty, (hereinafter referred to as James) under the name of Robert Haverty & Sons, in which decedent's *64 interest was 80 per cent and James' 20 per cent. The partnership kept its books and filed its tax returns on an accrual basis. Its duration was from July 1, 1946, to June 30, 1947, when it was dissolved. Subsequent to June 30, 1947, decedent again carried on the business as a sole proprietorship. The business of "factory representative" consists of selling manufactured products on either a direct percentage basis or a "drop shipment" basis. In the latter the factory representative pays the factory when the goods are shipped and bills the buyer for reimbursement. Both methods were here used, and the bulk of the partnership business was thus conducted. However, some goods such as tricycles and similar items were purchased by it and later wholesaled to customers. In the taxable years, due to the war, there was a scarcity of goods. This condition caused factory representatives to cultivate the good will of factories in securing agency representation and priority in filling selling orders. Many of these factories were small plants of limited capital, and it was usual and customary in the taxable years for factory representatives in the furtherance of their business to extend credit *65 or give financial assistance to such plants, and decedent, in the taxable years and prior thereto, did give such assistance to some of the firms he represented. The Collierville Manufacturing Company, Inc., hereinafter referred to as the corporation, was organized July 1, 1946, to engage in the making of furniture. It issued $30,000 of capital stock, of which 51 per cent was issued to James and the remainder to persons not related to him or decedent. It acquired the business of a partnership which had been operating under the same name in Collierville, Tennessee. An audit made of the books of the corporation's predecessor indicated that it had an operating profit of about $31,000 from July 1, 1945, to May 31, 1946. The corporation was one of the factories represented by the partnership. James was vice-president, secretary and treasurer of the corporation. Decedent was not an officer of the corporation. On July 3, 1946, decedent signed an instrument in which he guaranteed the credit of the corporation with the Union Planters National Bank & Trust Company of Memphis, hereinafter called the bank, to the extent of $40,000, and on the same date the corporation borrowed $23,410.77 from *66 the bank, and on July 26, 1946, $16,589.23, or a total of $40,000, to obtain working capital. The partnership agreement provided that neither decedent nor James should, without the consent of the other, become surety for third persons. Before signing the guaranty to the bank, decedent consulted James and secured his consent thereto; they both agreed that it was financially desirable to the partnership that he do so. The partnership then needed furniture for its customers, and this financial assistance to the corporation was designed to increase the corporation's production of same and also secure for the partnerships a preference in filling its orders and thereby increase the partnership's business. It was for this reason decedent guaranteed the bank loans. Thereafter the partnership booked orders aggregating $50,000 for the sale of the corporation's products, from which the partnership was to derive a substantial profit. Prior to the formation of the partnership decedent made six payments ranging in amount from $100 to about $1,500 to small manufacturers of products being sold by him in his business of factory representative as loans to create good will and with the hope of *67 getting preferential treatment on orders placed with them, or as advances against orders. Other factory representatives made payments for the same purpose. The corporation was not a success, due to production difficulties and inability to secure the right kind of lumber. In December 1946, decedent, at James' request, spent most of his time trying to increase its production. On January 15, 1947, decedent acquired from James 48 of his 51 per cent interest in the corporation. On January 28, 1947, its liabilities exceeded its assets by over $65,000, and on February 19, 1947, the corporation was adjudicated bankrupt. The corporation paid nothing on the bank loans. On February 19, 1947, decedent paid same in full from a loan he obtained from the bank on his personal note. In his return for 1947 decedent claimed a business bad debt deduction of $34,989.31 on account of payment of his guaranty to the bank. This amount was the difference between the corporation's debt to the bank, paid by decedent, and the amount decedent received from the trustee in bankruptcy of the corporation. Decedent did sustain a loss in that amount in the year 1947, and same was a business bad debt. Respondent *68 in his notice of deficiency disallowed in full this claimed bad debt deduction. In his return for 1947 decedent claimed a long-term capital loss of $15,000, one-half of which was taken in account, because of worthlessness of the stock he held of the corporation. The deduction was based upon cost of $15,000. He reported no long-term capital gain. The respondent disallowed the deduction upon the ground that decedent was not entitled to a deduction on account of worthlessness of the stock. The partnership filed returns on the basis of a fiscal year ended January 31. The partnership return filed for the period beginning July 1, 1946, and ending January 31, 1947, disclosed: (a) Net profits of $8,977.36, of which 80 percent, or $7,181.89, was shown as distributable to decedent. This $7,181.89 was not reported by decedent in his individual income tax return. (b) In the computation of the profit a deduction of $8,224.20 was claimed as a bad debt on account of bankruptcy of the corporation. This amount was the balance due the partnership on advances made by it to the corporation against future shipments, being partial prepayments of goods on order. Decedent's tax liability as to (a) *69 and (b) above was first raised by respondent in his amended pleadings. The return filed by the partnership for the period February 1, 1947, to June 30, 1947, reported a net loss of $345.16, of which $276.13 was shown as decedent's share. The amount of $276.13 was deducted by decedent in his return for 1947 as a loss sustained as a member of the partnership. The return of the partnership for the period ended January 31, 1947, showed no opening or closing inventory. The return for the period ended June 30, 1947, showed no opening inventory and a closing inventory of $24,049.70. Upon the dissolution of the partnership on that date, the goods on hand were acquired by decedent, whose return for 1947 showed an opening inventory on July 1, 1947, of $24,099.70, purchases thereafter of $996.80, and a closing inventory of $20,666. Opinion The claimed bad debt deduction of $34,989.31 for 1947 was disallowed by the respondent in his notice of deficiency upon the broad ground that decedent "had not established that he was entitled to any deduction under any Section of the Internal Revenue Code." On brief respondent, in support of his disallowance, specifically contends: (a) that decedent *70 did not "pay" the bank in 1947 the corporation debt which he had guaranteed, and in the alternative (b) that the bad debt resulting from decedent's guaranty agreement constituted a non-business bad debt, and the deduction is limited by the provisions of section 117 of the Code. As to (a), he cites Eckert v. Burnet, 283 U.S. 140, holding that a taxpayer on a cash basis has not sustained a deductible debt by merely exchanging his personal note upon which he is primarily liable for the note of another upon which he is secondarily liable. Petitioner contends that here there was no mere exchange of notes but a payment of the debt by him out of his personal funds. It is unnecessary to pass upon this phase of the question since we have found and hold as to this transaction that decedent was not upon a cash, but rather on an accrual basis of accounting and reporting, and hence Eckert v. Burnet is not applicable. In the taxable years decedent reported personal income upon a cash basis, while income and deductions relating to business activities he used an accrual system of accounting. This was permissible and proper. David Hanover, 12 T.C. 342. Finally, respondent *71 contends "that decedent's guarantee of the corporation's indebtedness was unrelated to his business activities and that any bad debt resulting therefrom must be reported in accordance with the method of accounting used in reporting decedent's personal income." This presents the same question raised in respondent's alternative plea (b) i.e., that the debt in question was "a nonbusiness bad debt". With this contention we can not agree. Under section 23 (k) (4), I.R.C., cited by respondent, the term "nonbusiness debt" is one "other than a debt * * * which is incurred in the taxpayer's trade or business." Section 29.23 (k)-6 of Regulations 111, applicable to the above section, provides that: "The character of the debt * * * is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a non-business debt for the purpose of this amendment." The debt in question was incurred by the decedent in direct connection *72 with and in furtherance of the operation of his business of factory representative, and it was proximately related thereto. This was true both at the time the debt was incurred and at the time that it became worthless, and hence, measured by the respondent's own regulation, it did not constitute a nonbusiness debt. Decedent's partnership was wholly dependent upon factories for all goods sold by it and its relationship to these sources of supply was vital. This was especially true in the taxable years when there was a shortage of goods, and it was usual and customary for factory representatives, in obtaining priority in the filling of orders, to extend financial aid to such factories. The bank loan which decedent guaranteed was to enable the corporation to produce more furniture and secure for the partnership more goods for sale. The bad debt arising therefrom may be deducted as a business bad debt by the same criteria which test the deduction of losses incurred in a taxpayer's trade or business. See H. R. Report 2333, 77th Congress, 2d Session, page 77. The business reason for the guaranty here is the same as that in William M. Lovering, 21 B.T.A. 1260, where it was *73 held that losses incurred by a commission broker endorsing the notes of a textile mill whose products he sold were losses resulting from the operation of his trade or business. Because on cross examination James testified that one reason for decedent's financial assistance to the corporation was to help establish James in business, respondent contends that decedent was actuated by personal rather than business reasons in making the loan guaranty. James' complete answer to this question, only part of which respondent quoted, gives both the business and the personal reasons therefor. Considering all of James' testimony and the evidence as a whole, we are convinced that the predominent reason actuating decedent in giving financial assistance to the corporation was to aid his business as a factory representative. Decedent knew that with increased capital the corporation could manufacture more furniture, and with James directing its operations, the partnership would be given a high priority in filling its orders. We hold that decedent was entitled to a bad debt deduction of $34,989.31 in 1947, as claimed by him, and respondent's disallowance of same is reversed. As to petitioner's *74 claim that decedent sustained a capital loss of $7,500 due to the worthlessness of certain stock of the corporation which he acquired from his son on January 15, 1947, the respondent must be sustained. No evidence was offered by the petitioner as to the cost of this stock to decedent, and there is no evidence in the record from which this fact may be ascertained. Petitioner having failed to prove any cost basis for deduction purposes, it follows that no error is shown to have been committed by respondent in disallowing the deduction. Furthermore, it would appear that this stock was either worthless, or of very small value when it was transferred to decedent, since within two weeks thereafter the corporation was placed in receivership and its liability exceeded its assets by $65,584.88. Respondent's increase of decedent's income for 1947 in the amount of $7,181.89 is sustained. The partnership return shows that this amount was decedent's distributive share of earned income. Decedent failed to report same in his individual income tax return and petitioner on brief admits that it was "inadvertently overlooked." Respondent's disallowance of the partnership claim of $8,224.20 as a bad *75 debt on account of the bankruptcy of the corporation is reversed. This sum was due the partnership on advances made by it to the corporation against future shipments, being partial prepayment of goods on order, and is therefore deductible. Obviously this debt was created in the business conducted by the partnership and is properly deductible as a business bad debt. Decisions will be entered under Rule 50.